1 | HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
2 | KRISTA L. BAUGHMAN (SBN: 264600)
kbaughman@dhillonlaw.com
3 | JOHN-PAUL S. DEOL (SBN: 284893)
jpdeol@dhillonlaw.com
4 | DHILLON LAW GROUP INC.
177 Post Street, Suite 700
5 | San Francisco, California 94108
Telephone: (415) 433-1700
6 | Facsimile: (415) 520-6593

7

8 | Attorneys for Plaintiff Conal O'Rourke

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

11

12 | CONAL O'ROURKE, an individual;     Case Number:  5:14-cv-4637

13 |      Plaintiff,     **FIRST AMENDED COMPLAINT (DEMAND FOR JURY TRIAL)**

14 |      v.

15 | COMCAST CORPORATION, a Pennsylvania
16 | Corporation; LAWRENCE SALVA, an
individual; and DOES 1-10, unknown
17 | individuals;

18 |      Defendants.

19

| | |
|---|---|
| CONAL O'ROURKE, an individual; | Case Number:  5:14-cv-4637 |
|     Plaintiff, | **FIRST AMENDED COMPLAINT (DEMAND FOR JURY TRIAL)** |
|     v. | 1. **Violation of the Cable Communications Policy Act [47 U.S.C. §§ 551(c), 551(f)]** |
| COMCAST CORPORATION, a Pennsylvania Corporation; LAWRENCE SALVA, an individual; and DOES 1-10, unknown individuals; | 2. **Defamation Per Se [Civ. Code § 44 *et seq.*]** |
|     Defendants. | 3. **Defamation Per Quod [Civ. Code § 44 *et seq.*]** |
| | 4. **Breach of Contract** |
| | 5. **Intentional Infliction of Emotional Distress** |
| | 6. **Invasion of Privacy (Public Disclosure of Private Facts)** |
| | 7. **Unfair Business Practices [Bus. & Prof. Code § 17200 *et seq.*]** |

     Conal O'Rourke ("Mr. O'Rourke" or "Plaintiff"), by and through his attorneys, Dhillon Law Group Inc., files this First Amended Complaint against Comcast Corporation ("Comcast"), Lawrence Salva ("Salva"), and DOES 1-10 ("Does") (collectively, "Defendants"), and alleges as follows:



**INTRODUCTION**

1.      Conal O'Rourke brings this lawsuit because Comcast made deliberately false and damaging allegations about him to his employer, PricewaterhouseCoopers ("PWC"), and disclosed his personally identifiable information to third parties, including the general public, without his consent, in violation of state and federal laws. Comcast's willful and malicious conduct caused Mr. O'Rourke to lose his job and suffer tremendous economic and emotional damages.

2.      Mr. O'Rourke's story is both simple and chilling. After being overcharged by Comcast for months on end, receiving a shipment of almost $2,000 worth of equipment that he had never ordered, being wrongfully sent to collections on his account that was not past due, suffering missed customer service appointments, receiving multiple harassing and bizarre calls from Comcast, and failing to get any help from Comcast's legendarily poor customer service, Mr. O'Rourke contacted the office of Comcast's top accountant, Controller Lawrence Salva. This fateful call by a customer to the accounting epicenter of cable duopolist Comcast, triggered a vicious and malicious reaction from Comcast and Mr. Salva that resulted in the destruction of Mr. O'Rourke's professional career, reputation, and life as he had known it. For these wrongs, Mr. O'Rourke comes to this Court seeking recompense.

**THE PARTIES**

3.      Plaintiff Conal O'Rourke is an individual who, at all times relevant to the First Amended Complaint, lived and worked in San Jose, California.

4.      Defendant Comcast is a corporation that, at all times relevant to the First Amended Complaint, was incorporated under the laws of the state of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania. Comcast is registered with the California Secretary of State and transacts business in California.

5.      Defendant Salva is an individual who, at all times relevant to the First Amended Complaint, worked for Defendant Comcast in Philadelphia, Pennsylvania as Senior Vice President, Chief Accounting Officer, and Controller of Comcast. Upon information and belief, Defendant Salva lives in Pennsylvania.

First Amended Complaint                                                     Case No. 5:14-cv-4637

1    6.    Upon information and belief, Defendants Does 1-10 are individual employees of

2    Comcast. Mr. O'Rourke is ignorant of the true names and capacities of defendants sued herein as

3    Does 1-10, inclusive, and therefore sues these defendants by these fictitious names. Mr.

4    O'Rourke will amend this First Amended Complaint to allege their true names and capacities

5    when ascertained.

6    7.    Mr. O'Rourke is informed and believes and thereon alleges that at all times

7    material to this First Amended Complaint, Defendants and each and every one of them, in

8    addition to acting for himself, herself or itself, and on his, her or its own behalf individually, is

9    and was acting as the agent, servant, employee and representative of, and with the knowledge,

10   consent and permission of, and in conspiracy with, each and all of the Defendants and within the

11   course, scope and authority of that agency, service, employment, representation and conspiracy.

12   Mr. O'Rourke further alleges on information and belief that the acts of each Defendant were

13   fully ratified by each and all of the other Defendants. Specifically, and without limitation, Mr.

14   O'Rourke alleges on information and belief that the actions, failures to act, tortious conduct, and

15   misrepresentations alleged herein and attributed to one or more of the specific Defendants were

16   approved, ratified and done with the cooperation and knowledge of each and all of the

17   Defendants.

18   8.    The allegations of this First Amended Complaint stated on information and belief

19   are likely to have evidentiary support after a reasonable opportunity for further investigation and

20   discovery.

21                                    **JURISDICTION**

22   9.    This Court has federal question jurisdiction under 28 U.S.C. § 1331, because Mr.

23   O'Rourke pleads a claim that arises under the laws of the United States, namely the Cable

24   Communications Policy Act, 47 U.S.C. § 521 *et seq.* This Court also has federal question

25   jurisdiction under 47 U.S.C. § 551(f)(1), which explicitly provides that Mr. O'Rourke may sue in

26   federal district court for any violation of that section.

27   10.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Mr.

28   O'Rourke's state law claims, because they form part of the same case or controversy under

First Amended Complaint                                          Case No. 5:14-cv-4637

1   Article III of the United States Constitution as Mr. O'Rourke's federal claim.

2   11.   This Court has diversity jurisdiction over the state law claims under 28 U.S.C. §

3   1332(a), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and

4   all parties to this action are citizens of different states. Mr. O'Rourke is a citizen of California,

5   domiciled in San Jose, California. Defendant Comcast is a corporation that maintains business

6   operations in Pennsylvania, and throughout the United States. Defendant Salva, on information

7   and belief, is a citizen of Pennsylvania domiciled in Pennsylvania.

8   **VENUE**

9   12.   Venue is proper in the United States District Court for the Northern District of

10   California pursuant to 28 U.S.C. §§ 1391(b)(c), because Mr. O'Rourke has resided in this district

11   at all times relevant to these claims such that a substantial part of the events or omissions giving

12   rise to the claims occurred in this judicial district.  Furthermore, venue is proper because

13   Defendants are subject to the Court's jurisdiction within this district, as they have sufficient

14   minimum contacts within the district to subject them to personal jurisdiction.

15   **INTRADISTRICT ASSIGNMENT**

16   13.   This First Amended Complaint is assigned to the San Jose Division pursuant to

17   Civil Local Rules 3-2(c) and 3-2(e), because a substantial part of the events or omissions giving

18   rise to the claims occurred in San Jose, Santa Clara County, California.

19   **FACTUAL ALLEGATIONS**

20
    **Conal O'Rourke Was an Accomplished and Successful Professional**
21   **Before Comcast Destroyed His Career**

22   14.   Conal O'Rourke is an established and well-regarded accounting professional with

23   more than twenty years of experience in his profession. Until recently, Mr. O'Rourke had a job

24   he loved at the prestigious accounting firm PricewaterhouseCoopers ("PWC"). Until Comcast

25   destroyed his career, Mr. O'Rourke was a Comcast subscriber in California. Although these two

26   facts would appear at first to be unrelated, it was Mr. O'Rourke's business relationship with

27   Comcast that led directly to the abrupt and wrongful termination of his employment with PWC.

28   15.   In 2012, Mr. O'Rourke moved to California to begin working for PWC in San



First Amended Complaint                                    Case No. 5:14-cv-4637

1  Jose. He had dreamed of moving to California for years, and was excited to begin a new job with

2  such a prestigious and well-regarded firm in his chosen field of accounting.

3      16.     Beginning in 2012, Mr. O'Rourke worked as a Senior Associate in the Learning

4  and Development division at PWC. Mr. O'Rourke's reviews were overwhelmingly positive – he

5  received an "exceeds expectations" rating on his last two reviews, and he looked forward to a

6  long career with PWC. In the two years he worked at PWC, Mr. O'Rourke received several

7  special bonus awards, and more than half-a-dozen commendations.

8      17.     Before working at PWC, Mr. O'Rourke had remained at his last major employer,

9  Accenture, for almost twenty years, where he worked in corporate controllership in several

10 locations throughout the United States. Mr. O'Rourke's career at Accenture was similarly

11 distinguished. Mr. O'Rourke received multiple awards for excellence, contribution and

12 performance.

13     18.     Mr. O'Rourke had never received any negative performance evaluations from

14 PWC until Comcast interfered with his employment by making deliberately and maliciously

15 false statements about Mr. O'Rourke to PWC.

16         **Mr. O'Rourke Becomes a Comcast Customer, and Is Routinely Overbilled**

17     19.     Mr. O'Rourke's problems with Comcast began in February of 2013 – the very

18 month and year in which Mr. O'Rourke initially began receiving Comcast TV and internet

19 services at his home. From the very beginning, although Mr. O'Rourke was promised a nine-

20 month promotional discount for premium channels, Mr. O'Rourke was overcharged for these

21 services, and was also charged unauthorized fees for inactivated outlets and set-top boxes.

22     20.     Comcast habitually misspelled Mr. O'Rourke's name as "Mr. O'Kourke," making

23 it difficult for him to receive his Comcast bills in a timely fashion, because the postal service

24 would fail to deliver them. Ultimately, Mr. O'Rourke convinced the postal service to deliver

25 mail to him that was addressed to "Mr. O'Kourke," after he was unable to convince Comcast to

26 correct the spelling of his name.

27     21.     After Comcast repeatedly failed to address Mr. O'Rourke's concerns over the

28 phone, on May 20, 2013, Mr. O'Rourke met with Comcast Assistant Manager Ryan Delerosa for

First Amended Complaint                                        Case No. 5:14-cv-4637

1   the first time, at the San Jose Comcast office, to address Comcast's pattern and practice of

2   overcharging him. Although Delerosa assured Mr. O'Rourke that his billing problems would be

3   addressed, they never were.

4      22.   Mr. O'Rourke followed up with Mr. Delerosa by leaving a voicemail message for

5   him on August 14, 2013, but Mr. Delerosa never called him back, and Mr. O'Rourke continued

6   to be overcharged by Comcast.

7      23.   On October 28, 2013, frustrated with Comcast's ongoing billing issues, lack of

8   responsiveness, and persistently slow internet speeds, Mr. O'Rourke attempted to cancel his

9   Comcast service. As is true for many Comcast subscribers, his efforts proved fruitless. Instead, a

10  Comcast representative promised that his billing issues would be resolved, and Mr. O'Rourke

11  was provided with the Movie Channel for three months and a free DVR to compensate him for

12  prior inconveniences. Despite the promises made by customer service, the billing department

13  never followed up with Mr. O'Rourke to correct the prior errors on his bill, and he continued to

14  be overcharged.

15     24.   In addition to Comcast's continual failure to address Mr. O'Rourke's billing

16  issues, in late November or early December of 2013, when Mr. O'Rourke was out of town,

17  Comcast shipped Mr. O'Rourke twelve random pieces of Comcast equipment. Comcast then

18  charged Mr. O'Rourke almost $2,000 in fees for equipment that he had neither requested nor

19  wanted.

20     25.   On December 30, 2013, Mr. O'Rourke personally returned all twelve pieces of

21  equipment to a Comcast office in San Jose. Comcast refunded Mr. O'Rourke the almost $2,000

22  in charges. On that same day, while at the San Jose office, Mr. O'Rourke also provided Comcast

23  with a detailed spreadsheet summarizing the dozens of billing errors on his account. Mr.

24  O'Rourke discussed the billing errors with an agent named Janet, and her manager, Matt

25  Dobilas.

26     26.   Despite the fact that Mr. O'Rourke discussed the billing errors and the

27  spreadsheet with Mr. Dobilas in detail on December 30, 2013, and subsequently emailed Mr.

28  Dobilas a copy of the spreadsheet and a total amount of money by which he was overcharged,

First Amended Complaint                                   Case No. 5:14-cv-4637

1    Comcast did not resolve Mr. O'Rourke's overbilling issues.

2        27.    On January 11, 2014, Mr. O'Rourke emailed Mr. Dobilas a draft letter he

3    intended to mail to Comcast's Controller, Lawrence Salva. Mr. O'Rourke had obtained Mr.

4    Salva's contact information from Hoover.com, a website operated by Dun & Bradstreet that

5    aggregates information about publically-traded companies and their executives. Before this time,

6    Mr. O'Rourke had not known who Mr. Salva was.

7        28.    In the draft letter to Mr. Salva that Mr. O'Rourke emailed to Mr. Dobilas, Mr.

8    O'Rourke detailed his issues with poor Comcast customer service and overbilling, hoping that

9    Mr. Dobilas would appreciate the seriousness of the situation, and respond. Mr. Dobilas did not

10   respond – nor, indeed, did anyone from Comcast.

11    **Mr. O'Rourke Is Shunted to Collections and Contacts Comcast's Controller**

12       29.    Shortly after Mr. O'Rourke sent Mr. Dobilas the letter of complaint he intended to

13   send to Comcast's Controller, Mr. Salva, he was contacted by Comcast's collections division on

14   February 5, 2014, for allegedly being two months past due on his account. Mr. O'Rourke's

15   account was not past due. Mr. O'Rourke explained his account history to the Comcast collections

16   employee to clarify that the account was not two months past due, or past due at all, and that he

17   should not be subject to hounding collection calls. However, the Comcast employee informed

18   Mr. O'Rourke that the Comcast employee could not resolve the matter, and that Mr. O'Rourke

19   would need to contact customer service again.

20       30.    Fearing that his credit would be damaged by Comcast's persistent incompetence,

21   and dreading being plunged again into the endless loop of purgatory that is Comcast customer

22   service, Mr. O'Rourke resolved to contact Comcast's Controller, Mr. Salva.

23       31.    At 2:42 p.m. on February 6, 2014, the day after the harassing collections call, Mr.

24   O'Rourke contacted Mr. Salva's office, and requested assistance with his account. He spoke to

25   Susan Pilla, Mr. Salva's Executive Assistant, and detailed his lengthy customer service and

26   billing complaints, and Comcast's failure to remedy them despite promising to do so on more

27   than a dozen occasions. By this time, Mr. O'Rourke had been a Comcast customer for almost a

28   year, and had not received a single bill in which he was correctly charged. Mr. O'Rourke also



First Amended Complaint                                          Case No. 5:14-cv-4637

1   complained to Ms. Pilla that Comcast representatives had failed to show up for several scheduled

2   service appointments, without any explanation.

3          32.     During his first call with Ms. Pilla, Mr. O'Rourke also raised concerns that

4   Comcast had systemic accounting failures that prevented it from billing its customers properly.

5   Mr. O'Rourke stated that because he had become aware from performing research online that

6   many other customers were facing the exact same problems with being overcharged that he was,

7   perhaps the best way to address Comcast's accounting would be to contact the Public Company

8   Accounting Oversight Board ("PCAOB") so that it could investigate Mr. O'Rourke's and other

9   customers' concerns about Comcast's gross accounting irregularities. The PCAOB, as both Mr.

10  O'Rourke and Comcast's Controller's office knew, is a post-Enron non-profit corporation

11  established by Congress that is responsible for overseeing the accounting of public companies

12  such as Comcast.

13         33.     Ms. Pilla offered to provide Mr. O'Rourke with a direct phone number for a

14  person who could address his complaints, or to arrange for someone to call him. Mr. O'Rourke

15  opted to have a Comcast representative contact him, as Ms. Pilla had offered. He waited for the

16  call from Comcast that was promised to address his concerns.

17         34.     Instead of being contacted by a representative who could solve his problems, at

18  3:45 p.m. on February 6, 2014, Mr. O'Rourke received a bizarre call from a woman named

19  Evelyn, who eventually identified herself as being from Comcast. Upon information and belief,

20  this individual was Evelyn Gonzalez-Williams, a Comcast Executive Customer Relations

21  professional in Comcast's West Division. The call was similar to the various Comcast customer

22  service calls that have been reported on extensively in 2014 in that it was hostile, unhelpful, and

23  inappropriately aggressive.

24         35.     Ms. Gonzalez-Williams initiated the call by asking Mr. O'Rourke "How can I

25  help you?" without introducing herself, explaining where she was calling from, or why she was

26  calling. Mr. O'Rourke asked her why she was calling, and she then told him that she was calling

27  about a missed appointment. Comcast had missed so many appointments with Mr. O'Rourke by

28  that time that he had no idea which missed appointment Ms. Gonzalez-Williams was referring to.



First Amended Complaint                                              Case No. 5:14-cv-4637

1   When he began trying to explain the situation, and that his main concern was with billing

2   problems, Ms. Gonzalez-Williams began to berate him, claiming that the technician had kept

3   "the appointment" (the date and time of which she never specified) and haranguing Mr.

4   O'Rourke to tell her the color of his house (incidentally, he lives in a condominium).

5          36.    When Mr. O'Rourke tried to redirect Ms. Gonzalez-Williams by pointing out that

6   he had called Comcast's Controller's office earlier in the day to discuss billing complaints, Ms.

7   Gonzalez-Williams began to act even more agitated and angry. Instead of listening to Mr.

8   O'Rourke, Ms. Gonzalez-Williams demanded that Mr. O'Rourke "just answer the question"

9   about the color of his house. Mr. O'Rourke declined to do so, informed her that he was going to

10  call the Controller's office again, and requested that Comcast "do its homework" before

11  contacting Mr. O'Rourke again.

12         37.    True to his word, at 4:00 p.m. on February 6, 2014, Mr. O'Rourke placed a

13  second call to Mr. Salva's office, and again spoke with Ms. Pilla. In this call, Mr. O'Rourke

14  expressed frustration over Ms. Gonzalez-Williams' unprofessional, unhelpful and angry diatribe.

15  Mr. O'Rourke repeated his earlier complaints, as well as his concerns about Comcast's apparent

16  systemic accounting failures, and again mentioned that perhaps the best way to address

17  Comcast's accounting was to contact the PCAOB.

18         38.    At no time during his two calls with Ms. Pilla on February 6, 2014, did Mr.

19  O'Rourke identify his employer.

20         39.    At no time during his two calls with Ms. Pilla on February 6, 2014, did Mr.

21  O'Rourke use any offensive language towards her.

22  **Mr. Salva and Ms. Pilla Defame Mr. O'Rourke in Retaliation for His Complaints**

23  **Regarding Deficient Customer Service and Faulty Accounting**

24         40.    For the first time in Mr. O'Rourke's year of being a Comcast customer, Comcast

25  reacted swiftly and efficiently to his phone calls. Unfortunately, instead of redressing Mr.

26  O'Rourke's grievances, Comcast initiated a scorched-earth assault against him for expressing

27  valid, widely-held concerns over the legality of its conduct and the integrity of its accounting. On

28  information and belief, Defendants undertook these actions because they were concerned that



9

1  Mr. O'Rourke would report Comcast to the PCAOB, were angry that he had accused Comcast of

2  shoddy accounting practices, and wished to punish and destroy him for his temerity.

3      41.    On information and belief, after Mr. O'Rourke stated that Comcast should be

4  investigated by the PCAOB, Ms. Pilla learned that Mr. O'Rourke worked for PWC. Ms. Pilla

5  suspected that Mr. O'Rourke worked in the accounting industry, because he had known to

6  contact the Controller's office regarding accounting irregularities, and had threatened to report

7  such irregularities to the PCAOB.

8      42.    Within minutes after Mr. O'Rourke's second call to Ms. Pilla, Ms. Pilla falsely

9  stated to Mr. Salva and others at Comcast that Mr. O'Rourke had told her that Mr. O'Rourke was

10  a "Partner" of PWC who had formerly worked with Mr. Salva when Mr. Salva was also a PWC

11  Partner. Ms. Pilla also falsely stated to Mr. Salva that Mr. O'Rourke had called her a "buffoon,"

12  used profanity, and was abusive and "nasty."

13      43.    Because Comcast was a major consulting services client of PWC's, as Mr.

14  O'Rourke has since learned, Mr. Salva, himself a former partner at PWC, contacted Mr. Joseph

15  Atkinson, a principal in the Philadelphia office of PWC, and defamed Mr. O'Rourke by accusing

16  him of an ethics violation. This call was made at 4:09 p.m., approximately 9 minutes after Mr.

17  O'Rourke's second call to Ms. Pilla.

18      44.    In his call to Mr. Atkinson, Mr. Salva falsely and maliciously stated that Mr.

19  O'Rourke had invoked his employment as a "Partner" of PWC in an attempt to somehow obtain

20  leverage in his customer negotiations with Comcast, and also falsely told Mr. Atkinson that Mr.

21  O'Rourke had "yelled at" Ms. Pilla and had engaged in "inappropriate" and "abusive" conduct

22  towards Ms. Pilla.

23      45.    On information and belief, Defendant Salva either directly asked for Mr.

24  O'Rourke's termination, or implicitly requested and caused it by making the knowingly false,

25  defamatory, and malicious accusations that Mr. O'Rourke had violated accounting ethics rules

26  by attempting to use his employment with PWC as leverage in his "negotiations" with Comcast,

27  and by acting inappropriately towards Ms. Pilla. As a former partner of PWC familiar with its

28  internal guidelines and ethical standards, Mr. Salva knew well that his accusations, to a

First Amended Complaint                                    Case No. 5:14-cv-4637

1  relationship partner for the Comcast relationship at PWC, would destroy Mr. O'Rourke's career

2  there, regardless of the merits of his allegations.

3       46.     Approximately 20 minutes after Mr. Salva's call with Mr. Atkinson, around 4:30

4  p.m., Mr. O'Rourke received a call from Mr. Atkinson. Mr. O'Rourke was shocked to receive

5  the call – he had never before had occasion to deal with Mr. Atkinson, who worked three time

6  zones away. An angry Mr. Atkinson informed Mr. O'Rourke that he had received a call from

7  Comcast's Controller about Mr. O'Rourke.

8       47.     Mr. Atkinson told Mr. O'Rourke that "the client" (Comcast) was very angry, very

9  valuable, was in fact the Philadelphia office's largest client with billings exceeding $30 million

10 per year. Mr. Atkinson also told Mr. O'Rourke that the Comcast-PWC relationship was already

11 "rocky," further underscoring the alleged impact of Mr. O'Rourke's complaints.

12      48.     Mr. Atkinson told Mr. O'Rourke that Mr. O'Rourke was not to speak with

13 anyone from Comcast without Mr. Atkinson's prior permission.

14      49.     At 4:59 p.m. on February 6, 2014, Mr. O'Rourke received a voicemail from the

15 manager of Comcast's West Region Executive Customer Relations, Ms. Linda Rhome, in

16 connection with setting up a home service repair appointment. Mr. O'Rourke forwarded Mr.

17 Atkinson a copy of this voicemail at 5:17, and sought and received Mr. Atkinson's permission to

18 return this customer service call.

19      50.     At 5:30 p.m., Mr. O'Rourke returned Ms. Rhome's phone call, and scheduled a

20 home service repair appointment for the following day, February 7, 2014, between 1:00 p.m. and

21 3:00 p.m.

22      51.     Comcast failed to show up for the scheduled service appointment on February 7,

23 2014. The appointment was rescheduled to February 11, 2014.

24      52.     For the first time in his career, Mr. O'Rourke was subjected to an ethics

25 investigation as a result of the false and defamatory allegations levied against him by

26 Defendants. On the morning of February 7, 2014, Mr. O'Rourke spoke by phone with Mr.

27 Steven Kessler from PWC Ethics and Compliance, and with PWC Human Resource Director,

28 Ms. Bonnie Bishop. This was the only interview of Mr. O'Rourke that PWC's Human Resources

First Amended Complaint                          Case No. 5:14-cv-4637

DLG

DHILLON LAW GROUP INC.

1    department conducted as part of its investigation.

2        53.     In the course of the ethics investigation, Mr. O'Rourke learned that Defendants

3    had falsely accused him of referencing his employment with PWC in a call or calls with

4    Comcast, and attempting to use it as "leverage" in his negotiations with Comcast.

5        54.     In the course of the ethics investigation, Mr. O'Rourke explained that he had

6    never mentioned his employment with PWC in his phone calls with Comcast, and that he had

7    never attempted to use his employment at PWC as leverage. Furthermore, Mr. O'Rourke

8    explained that because Comcast was a major consulting client of PWC's, he had no leverage

9    (leverage, if any, would have been on Comcast's side of the table); and that he was not

10   negotiating with Comcast or attempting to obtain any special treatment. Instead, he had simply

11   requested that billing errors that had sent him to collections, and persistent failed service issues,

12   be addressed.

13       55.     Mr. O'Rourke repeatedly requested that PWC obtain recordings of his calls with

14   Comcast on February 6, 2014, to prove his innocence, but PWC failed to do so. PWC also failed

15   to interview Ms. Pilla as part of its investigation.

16       56.     On February 11, 2014, the day that Comcast had been rescheduled for a missed

17   service appointment at Mr. O'Rourke's home, Comcast failed to show up.

18                    **Mr. O'Rourke Is Terminated Because of Comcast's Statements**

19       57.     On February 18, 2014, during an in-person meeting, Mr. O'Rourke was informed

20   that he was being terminated for an ethics violation for using PWC's name as "leverage" in his

21   communications with Comcast.

22       58.     During the February 18 meeting at PWC, Mr. O'Rourke was told that this

23   termination was based not only on Mr. Salva's call on February 6 to Mr. Atkinson, but also on a

24   Comcast internal email purporting to describe Mr. O'Rourke's conversations with Comcast

25   employees, including details of his business relationship with Comcast. Although Mr. O'Rourke

26   requested the email, he was not permitted to see it until several months after he filed this lawsuit.

27       59.     Mr. O'Rourke was shocked, humiliated and ashamed as a result of the unjustified

28   loss of his job caused by the knowingly and maliciously false and defamatory statements



First Amended Complaint                                    Case No. 5:14-cv-4637

1      Comcast employees made about Mr. O'Rourke. He sought counseling, and was prescribed

2      medication to address his emotional distress.

3      **Mr. O'Rourke Terminates His Relationship With Comcast**

4      60.      On March 10, 2014, Mr. O'Rourke finally succeeded in terminating his service

5      with Comcast.

6      61.      Comcast never refunded Mr. O'Rourke the money he was overcharged, and also

7      refused to give him the two $20 credits he was entitled to, as per Comcast advertisements, as a

8      result of Comcast's failure to attend the two service calls it scheduled for Mr. O'Rourke in

9      February of 2014.

10      62.      On June 16, 2014, Mr. O'Rourke requested a copy of his February bill (which he

11      had never received) in a phone call to Comcast. After initially promising to email the bill to him,

12      Comcast ultimately denied this request. Mr. O'Rourke was informed that if he wanted a copy of

13      the bill, he would have to visit a Comcast location. Mr. O'Rourke declined to do so.

14      **Comcast Discloses Personally Identifiable Information**

15      **About Mr. O'Rourke Publicly**

16      63.      On October 7, 2014, the technology news and information website *Ars Technica*

17      published an article entitled "Comcast got me fired after billing dispute, says California man,"

18      concerning Mr. O'Rourke's complaints against Comcast as discussed above.

19      64.      The following day, Comcast issued "A Public Apology to Conal O'Rourke" on its

20      company blog, in which Comcast called its customer service mistreatment of Mr. O'Rourke

21      "completely unacceptable."

22      65.      On the morning of October 17, 2014 – the day after Mr. O'Rourke's original

23      Complaint was filed in this matter – Comcast issued a press statement that stated "we have

24      listened to recorded calls between Mr. O'Rourke and our customer service representatives and

25      his treatment of them and his language is totally unspeakable."

26      66.      The statements contained in Comcast's October 17, 2014 press statement –

27      including that Mr. O'Rourke had engaged in "totally unspeakable" conduct during customer

28      service calls and collections calls with Comcast – were quoted in several publications, including



First Amended Complaint            Case No. 5:14-cv-4637

1  but not limited to in articles published on October 17, 2014 by Philly.com, Law360,

2  Consumerist.com, nationaljournal.com, and Gawker.com.

3        67.    Comcast receives and records customer service calls as part of its provision of

4  cable services, including as part of subscriber interaction required for the use of cable services.

5  Millions of Americans are forced every year by a combination of Comcast's duopoly market

6  power and its atrocious customer service, to call Comcast seeking redress with their accounts,

7  and are duly recorded during such calls, ostensibly for "quality assurance purposes," but

8  apparently also for Comcast's self-serving, and sometimes retaliatory, purposes.

9        68.    At no time did Mr. O'Rourke give his consent for Comcast to release or in any

10  way characterize the contents of his customer service calls to the general public.

11        69.    On March 9, 2015, Comcast announced its promotion of Mr. Salva to Executive

12  Vice President, Chief Accounting Officer and Controller of Comcast – a promotion

13  accompanied, upon information and belief by materially increased salary and benefits, including

14  Comcast stock.

15        70.    Due to Comcast's statements about him to PWC, despite diligently seeking

16  employment, Mr. O'Rourke has been unable to obtain a new job since being abruptly terminated

17  by PWC in February of 2014. Mr. O'Rourke has also been forced to republish Comcast's false

18  and defamatory allegations against him in order to explain his termination from PWC during his

19  extensive job search.

20  **FIRST CAUSE OF ACTION**

21  **Violations of the Cable Communications Policy Act [47 U.S.C. §§ 551(c), 551(f)]**

22  **(Against all Defendants)**

23        71.    Mr. O'Rourke incorporates herein every allegation contained in the preceding

24  paragraphs, as though set forth fully herein.

25        72.    At all times relevant herein, Mr. O'Rourke was a cable "subscriber" within the

26  meaning of 47 U.S.C. § 551(c).

27        73.    At all times relevant herein,  Comcast was a "cable operator" within the meaning

28  of 47 U.S.C. §§ 551(c) and 522(5).

First Amended Complaint                  Case No. 5:14-cv-4637

74.     At all times relevant herein, Mr. Salva was a person who controls or is responsible for the management and operation of a cable system, and was also a person who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, within the meaning of 47 U.S.C. §522(5).

75.     On February 6, 2014, Mr. Salva disclosed personally identifiable information concerning Mr. O'Rourke to Mr. Atkinson of PWC, including Mr. O'Rourke's name, his employer, and the nature of his complaints against Comcast. This disclosure took place in a phone call Mr. Salva placed to Mr. Atkinson on February 7, 2014, as well as in email communications from Mr. Salva to Mr. Atkinson on February 6, 2014.

76.     In a press statement released by Comcast the morning of October 17, 2014, Comcast publicly stated that "we have listened to recorded calls between Mr. O'Rourke and our customer service representatives and his treatment of them and his language is totally unspeakable." This press statement was repeated in several publications, including but not limited to articles on Philly.com, Law360, Consumerist.com, nationaljournal.com, and Gawker.com on October 17, 2014.

77.     Mr. O'Rourke did not provide prior (or any) written or electronic consent to Defendants' disclosures of his personally identifiable information to his employer, PWC.

78.     Mr. O'Rourke did not provide prior (or any) written or electronic consent to Comcast's disclosure to the general public of his personally identifiable information, including information contained in Mr. O'Rourke's private communications with Comcast representatives during customer service calls, regarding his personal Comcast account.

79.     Mr. Salva's disclosures of Mr. O'Rourke's personally identifiable information to Mr. Atkinson on February 6, 2014, was not necessary to render or conduct a legitimate business activity related to Comcast's provision of services to Mr. O'Rourke.

80.     Comcast's disclosure of Mr. O'Rourke's personally identifiable information to the general public on October 17, 2014, was not necessary to render or conduct a legitimate business activity related to Comcast's provision of services to Mr. O'Rourke.

81.     When he made the disclosures about Mr. O'Rourke to Mr. Atkinson, Mr. Salva


DILLON LAW GROUP INC.

First Amended Complaint                                                      Case No. 5:14-cv-4637

1   was acting both in his individual capacity, and as the agent, servant, employee, and

2   representative of, and with the knowledge, consent, and permission of, and in conspiracy with

3   Comcast, and within the course, scope, and authority of that agency, service, employment,

4   representation and conspiracy.

5       82.    As a corporate officer, Mr. Salva is personally liable for all torts which he

6   authorizes or in which he participates, even where he acted as an agent of Comcast.

7       83.    Defendants' conduct as described above was a substantial factor in causing Mr.

8   O'Rourke's harm – namely, the loss of his job, his inability to find new employment to date, and

9   severe physical and emotional distress.

10      84.    As a direct and proximate result of Defendants' actions, Mr. O'Rourke has

11  suffered damages in a sum according to proof at trial, but believed at this time to exceed $2

12  million.

13      85.    Defendants' conduct as described above was willful and malicious, such that Mr.

14  O'Rourke is entitled to an award of punitive damages under 47 U.S.C. § 551(f)(2)(B), in an

15  amount to be proven at trial.

16      86.    Mr. O'Rourke demands reasonable attorneys' fees and litigation costs, as

17  permitted by 47 U.S.C. § 551(f)(2)(C).

18              **SECOND CAUSE OF ACTION**

19          **Defamation *Per Se* [Civ. Code § 44 *et seq.*]**

20                **(Against all Defendants)**

21      87.    Mr. O'Rourke incorporates herein every allegation contained in the preceding

22  paragraphs, as though set forth fully herein.

23      88.    Defendant Salva falsely stated to PWC Principal Joseph Atkinson and other PWC

24  employees that Mr. O'Rourke had, among other things:

25          a.  Mentioned his employment with PWC in his conversations with Comcast

26              employees;

27          b.  Claimed to be a "Partner" of PWC in his conversations with Comcast;

28          c.  Attempted to use his employment with PWC as leverage in his negotiations



First Amended Complaint                                Case No. 5:14-cv-4637

with Comcast;

d.   "Yelled at" Ms. Pilla and engaged in "inappropriate" and "abusive" conduct

towards her during the phone calls of February 6, 2014; and

e.   Violated accounting ethics in his interactions with Comcast.

89.    The recipients of Mr. Salva's statements, including Mr. Atkinson and other employees of both Comcast and PWC, knew that Mr. Salva's statements were about Mr. O'Rourke, a customer of Comcast.

90.    The recipients of Mr. Salva's statements, including Mr. Atkinson and other employees of both Comcast and PWC, reasonably understood Mr. Salva's statements about Mr. O'Rourke to mean that Mr. O'Rourke lacked ethics, integrity, and honesty, including as required in his profession.

91.    Mr. Salva's statements about Mr. O'Rourke tended to directly injure Mr. O'Rourke in respect to his profession, trade, or business, by imputing to him general disqualification in those respects which his occupation peculiarly requires and by imputing to him a lack of ethics with reference to his profession, trade or business that has a natural tendency to lessen its profits.

92.    Mr. Salva knew that the statements he made about Mr. O'Rourke were false, and/or he failed to use reasonable care to determine the truth or falsity of the statements he made about Mr. O'Rourke to PWC.

93.    Mr. Salva made the defamatory statements about Mr. O'Rourke in retaliation against Mr. O'Rourke for the complaints Mr. O'Rourke made about the gross inadequacies of the Comcast accounting department, which complaints necessarily implicated Mr. Salva's own professional reputation, as Comcast's Controller.

94.    Mr. Salva made these statements about Mr. O'Rourke with the expectation and intent that they would negatively affect and/or destroy Mr. O'Rourke's employment with PWC in California.

95.    When he made the defamatory statements about Mr. O'Rourke to PWC, Mr. Salva was acting both in his individual capacity, and as the agent, servant, employee, and

First Amended Complaint                                          Case No. 5:14-cv-4637



1 representative of, and with the knowledge, consent, and permission of, and in conspiracy with

2 Comcast, and within the course, scope, and authority of that agency, service, employment,

3 representation and conspiracy.

4      96.     As a corporate officer, Mr. Salva is personally liable for all torts which he

5 authorizes or in which he participates, even where he acted as an agent of Comcast.

6      97.     PWC terminated Mr. O'Rourke based on the statements made by Mr. Salva,

7 causing Mr. O'Rourke to lose his job, income, and benefits. Because the termination was for

8 cause and based on an alleged ethics violation, Mr. O'Rourke has been forced to republish these

9 statements in the course of looking for a new job, and has been unable to find work.

10      98.     Defendants' conduct as described above was a substantial factor in causing Mr.

11 O'Rourke's harm – namely, the loss of his job, and severe emotional distress.

12      99.     As a direct and proximate result of Defendants' actions, Mr. O'Rourke has

13 suffered damages in a sum according to proof at trial.

14      100.     Defendants' statements about Mr. O'Rourke were wanton, willful and intentional,

15 and committed with malicious and reckless disregard for Mr. O'Rourke's reputation. Mr.

16 O'Rourke is therefore entitled to an award of punitive damages in an amount to be proven at

17 trial.

18 **THIRD CAUSE OF ACTION**

19 **Defamation *Per Quod* [Civ. Code § 44 *et seq.*]**

20 **(Against all Defendants)**

21      101.     Mr. O'Rourke incorporates herein every allegation contained in the preceding

22 paragraphs, as though set forth fully herein.

23      102.     Defendant Salva falsely stated to PWC Principal Joseph Atkinson and other PWC

24 employees that Mr. O'Rourke had, among other things:

25         a.   Mentioned his employment with PWC in his conversations with Comcast

26             employees;

27         b.   Claimed to be a "Partner" of PWC in his conversations with Comcast;

28         c.   Attempted to use his employment with PWC as leverage in his negotiations



First Amended Complaint                          Case No. 5:14-cv-4637

1   with Comcast;

2       d.   "Yelled at" Ms. Pilla and engaged in "inappropriate" and "abusive" conduct

3           towards her during the phone calls of February 6, 2014; and

4       e.   Violated accounting ethics in his interactions with Comcast.

5   103.   The recipients of Mr. Salva's statements, including Mr. Atkinson and other

6   employees of both Comcast and PWC, knew that Mr. Salva's statements were about Mr.

7   O'Rourke.

8   104.   The recipients of Mr. Salva's statements, including Mr. Atkinson and other

9   employees of both Comcast and PWC, reasonably understood Mr. Salva's statements about Mr.

10   O'Rourke to mean that Mr. O'Rourke lacked ethics, integrity, and honesty, including as required

11   in his profession.

12   105.   Because of facts and circumstances perceived by the recipients of Mr. Salva's

13   statements, including Mr. Atkinson and other employees of both Comcast and PWC – namely,

14   that Mr. O'Rourke had behaved unethically by mentioning his employment with PWC to

15   Comcast, attempting to use his employment as leverage in his negotiations with Comcast,

16   "yelling at" Ms. Pilla and engaging in "inappropriate" and "abusive" conduct towards her, and

17   violating accounting firm ethics standards in his interactions with Comcast – Mr. Salva's

18   statements tended to injure Mr. O'Rourke in his occupation; exposed him to hatred, contempt,

19   ridicule and shame; and discouraged Mr. Atkinson and the other employees of both Comcast and

20   PWC from working with or associating with Mr. O'Rourke.

21   106.   Mr. Salva knew that the statements he made about Mr. O'Rourke were false,

22   and/or he failed to use reasonable care to determine the truth or falsity of the statements he made

23   about Mr. O'Rourke to PWC.

24   107.   Mr. Salva made the defamatory statements about Mr. O'Rourke in retaliation

25   against Mr. O'Rourke for the complaints Mr. O'Rourke made about the gross inadequacies of the

26   Comcast accounting department, which complaints necessarily implicated Mr. Salva's own

27   professional reputation, as Comcast's Controller.

28   108.   Mr. Salva made these statements about Mr. O'Rourke with the expectation and



19

intent that they would negatively affect and/or destroy Mr. O'Rourke's employment with PWC in California.

109. When he made the defamatory statements about Mr. O'Rourke to PWC, Mr. Salva was acting both in his individual capacity, and as the agent, servant, employee, and representative of, and with the knowledge, consent, and permission of, and in conspiracy with Comcast, and within the course, scope, and authority of that agency, service, employment, representation and conspiracy.

110. As a corporate officer, Mr. Salva is personally liable for all torts which he authorizes or in which he participates, even where he acted as an agent of Comcast.

111. PWC terminated Mr. O'Rourke based on Mr. Salva's statements, causing Mr. O'Rourke to lose his job, income, and benefits. Because the termination was for cause and based on an alleged ethics violation, Mr. O'Rourke has been forced to republish these statements in the course of looking for a new job, and has been unable to find work.

112. Defendants' conduct, as described above, was a substantial factor in causing Mr. O'Rourke's harm – namely, the loss of his job, and severe emotional distress.

113. As a direct and proximate result of Defendants' actions, Mr. O'Rourke has suffered damages in a sum according to proof at trial.

114. Defendants' statements about Mr. O'Rourke were wanton, willful and intentional, and committed with malicious and reckless disregard for Mr. O'Rourke's reputation. Mr. O'Rourke is therefore entitled to an award of punitive damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Breach of Contract

### (Against Defendant Comcast)

115. Mr. O'Rourke incorporates herein every allegation contained in the preceding paragraphs, as though set forth fully herein.

116. Mr. O'Rourke entered into a contract with Comcast, for Comcast to provide agreed-upon internet and cable services for an agreed-upon price for Mr. O'Rourke's benefit (the



First Amended Complaint                                    Case No. 5:14-cv-4637

1    "Agreement").

2    117.    Mr. O'Rourke performed all obligations required of it under the Agreement that

3    were not excused or discharged by Comcast's conduct.

4    118.    Comcast breached the Agreement when it engaged in the conduct described

5    above, including habitually overcharging Mr. O'Rourke, failing to show up for service

6    appointments, sending to and charging Mr. O'Rourke for equipment he neither ordered nor

7    needed, sending Mr. O'Rourke to collections even though his account was not in arrears, failing

8    to compensate Mr. O'Rourke for missed service appointments as promised, and failing to repair

9    his internet service.

10    119.    As a direct and proximate result of Defendant Comcast's actions, Mr. O'Rourke

11    has suffered damages in a sum according to proof at trial.

12                              **FIFTH CAUSE OF ACTION**

13                    **Intentional Infliction of Emotional Distress**

14                              **(Against all Defendants)**

15    120.    Mr. O'Rourke incorporates herein every allegation contained in the preceding

16    paragraphs, as though set forth fully herein.

17    121.    Defendants' conduct described above – including berating Mr. O'Rourke over the

18    phone, making false and defamatory statements about Mr. O'Rourke to third parties including

19    his employer, lobbying for his termination, causing him to lose his job, and issuing public

20    statements demonizing him and accusing him of engaging in "totally unspeakable" conduct –

21    was extreme, outrageous and despicable conduct.

22    122.    Defendants intended to cause Mr. O'Rourke emotional distress, and at all times

23    during which Defendants engaged in the wrongful conduct as described, Defendants acted with

24    reckless disregard of the probability that Mr. O'Rourke would suffer emotional distress.

25    123.    Defendants were aware that there was a substantial certainty that Mr. O'Rourke

26    would be severely embarrassed, humiliated, upset, distressed and physically and emotionally

27    damaged if he were subjected to such humiliating and degrading conduct.

28    124.    When Mr. Salva lobbied for the termination of Mr. O'Rourke's job, he was acting



First Amended Complaint                                    Case No. 5:14-cv-4637

both in his individual capacity, and as the agent, servant, employee, and representative of, and with the knowledge, consent, and permission of, and in conspiracy with Comcast, and within the course, scope, and authority of that agency, service, employment, representation and conspiracy.

125. As a corporate officer, Mr. Salva is personally liable for all torts which he authorizes or in which he participates, even where he acted as an agent of Comcast.

126. As a proximate result of Defendants' acts, Mr. O'Rourke has suffered, and continues to suffer, severe emotional distress including, but not limited to anxiety, shame, mood swings, difficulty sleeping, frustration, humiliation, worry, and indignity. Defendants' conduct was a substantial factor in causing Mr. O'Rourke's severe emotional distress.

127. As a direct and proximate result of Defendants' actions, Mr. O'Rourke has suffered damages in a sum according to proof at trial.

128. Defendants' conduct towards Mr. O'Rourke was wanton, willful and intentional, and committed with malicious intent. Mr. O'Rourke is therefore entitled to an award of punitive damages in an amount to be proven at trial.

<b>SIXTH CAUSE OF ACTION</b>

<b>Invasion of Privacy (Public Disclosure of Private Facts)</b>

<b>(Against Comcast)</b>

129. Mr. O'Rourke incorporates herein every allegation contained in the preceding paragraphs, as though set forth fully herein.

130. The recorded customer service telephone calls between Mr. O'Rourke and Comcast are private, and are not the subjects of legitimate public concern.

131. As described above, Comcast issued a press statement to the general public that stated "we have listened to recorded calls between Mr. O'Rourke and our customer service representatives and his treatment of them and his language is totally unspeakable."

132. Comcast's public disclosure of the existence and nature of Mr. O'Rourke's private calls to Comcast customer service – which disclosure falsely portrays Mr. O'Rourke as an individual lacking in decency, ethics and integrity – is offensive and objectionable to a reasonable person of ordinary sensibilities.



First Amended Complaint                                                  Case No. 5:14-cv-4637

133.    Prior to Comcast's press statement, the existence and nature of Mr. O'Rourke's private calls to Comcast customer service were not known to the public.

134.    Comcast disclosed the existence and nature of Mr. O'Rourke's private calls to Comcast customer service with knowledge that this disclosure was highly offensive or with reckless disregard of whether or not it was highly offensive.

135.    As a consequence of Comcast's conduct, Mr. O'Rourke's private information was disclosed, and Mr. O'Rourke has suffered damages in a sum according to proof at trial.

136.    Comcast's conduct towards Mr. O'Rourke was wanton, willful and intentional, and committed with malicious intent. Mr. O'Rourke is therefore entitled to an award of punitive damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**

**Unfair Business Practices (Bus. & Prof. Code §17200)**

**(Against all Defendants)**

137.    Mr. O'Rourke incorporates herein every allegation contained in the preceding paragraphs, as though set forth fully herein.

138.    Defendants engaged in unfair, unlawful and fraudulent business practices against Mr. O'Rourke, in violation of California Business & Professions Code § 17200 *et seq.,* by violating his privacy, defaming him to his employer, unfairly and persistently overcharging him, and retaliating against him for questioning the legality and propriety of its billing and collections practices, which violated state and federal laws including but not limited to: 47 U.S.C. §§ 551(c), 551(f) and Civ. Code § 44 *et seq.*

139.    In the course of the conduct discussed above, Mr. Salva was acting both in his individual capacity, and as the agent, servant, employee, and representative of, and with the knowledge, consent, and permission of, and in conspiracy with Comcast, and within the course, scope, and authority of that agency, service, employment, representation and conspiracy.

140.    As a corporate officer, Mr. Salva is personally liable for all torts which he authorizes or in which he participates, even where he acted as an agent of Comcast.

141.    As a direct and proximate result of Defendants' unfair, unlawful and fraudulent

First Amended Complaint                                    Case No. 5:14-cv-4637

1  practices described above, Mr. O'Rourke has suffered and will continue to suffer harm. Mr.

2  O'Rourke is entitled to such relief as may be necessary to restore to him all lost profits and other

3  monies owed and belonging to him, including interest thereon, that Defendants wrongfully

4  withheld from him and retained for themselves.

5       142.    Pursuant to Business & Professions Code § 17204, Mr. O'Rourke seeks an order

6  of this Court enjoining Defendants, and each of them, from continuing to engage in the following

7  acts, which acts constitute violations of Business & Professions Code § 17200 et seq.:

8               a.  Providing Mr. O'Rourke and other cable subscribers' personal information to

9                   third parties without their consent;

10              b.  Defaming cable subscribers to third parties;

11              c.  Overbilling of consumers;

12              d.  Retaliating against consumers; and

13              e.  Not providing promised remedies for missed appointments.

14      143.    Mr. O'Rourke and the public will be irreparably harmed if such an order is not

15  granted.

16                              **PRAYER FOR RELIEF**

17      WHEREFORE, Mr. O'Rourke prays for judgment against Defendants as follows:

18  1.      For all damages legally and/or proximately caused to Mr. O'Rourke by

19  Defendants totaling more than $5 million;

20  2.      For punitive damages;

21  3.      For injunctive relief barring Comcast from:

22          a.  Providing Mr. O'Rourke and other cable subscribers' personal information to

23              third parties without their consent;

24          b.  Defaming cable subscribers to third parties;

25          c.  Overbilling of consumers; and

26          d.  Retaliating against consumers for legitimate customer service complaints;

27  4.      For prejudgment interest;

28  5.      For costs of suit incurred herein;



24

1   6.      For attorneys' fees under 47 U.S.C. § 551(f)(2)(C); and

2   7.      For such further relief as the court considers proper.

3

4   Date: March 27, 2015                    DHILLON LAW GROUP INC.

5

6

7                                   By:    /s/ Krista L. Baughman
                                           Harmeet K. Dhillon
8                                          Krista L. Baughman
                                           John-Paul S. Deol
9                                          Attorneys for Plaintiff Conal O'Rourke

10

11                          **DEMAND FOR JURY TRIAL**

12        Mr. O'Rourke demands trial of all issues by jury.

13

14  Date: March 27, 2015                    DHILLON LAW GROUP INC.

15

16                                  By:    /s/ Krista L. Baughman
                                           Harmeet K. Dhillon
17                                         Krista L. Baughman
                                           John-Paul S. Deol
18                                         Attorneys for Plaintiff Conal O'Rourke

19

20

21

22

23

24

25

26

27

28



First Amended Complaint                                  Case No. 5:14-cv-4637